In 1894 a firm contracted to supply the city of Bayonne with water for use by its inhabitants over a term of years, *Page 175 
renewable for additional terms at the option of the complainant. The contract has been renewed, until now, if it is in force at all it will not expire before 1929, for one purpose, 1944 for another, and not then, the complainant maintains, if it elects to continue it in conformity with its provisions. This contract with the complainant was assigned by the above-mentioned firm in 1895 to the New York and New Jersey Water Company, and, subsequently, all the rights of the New York and New Jersey Water Company in the contract were assigned by it to the complainant, together with all the plant and other property connected therewith, in consideration of $2,017,000. Under the contract of 1894 it was the city's right to take so much water as it might require, and pay therefor according to a schedule of prices, decreasing as the quantity consumed daily increased, so that for the quantity of water that Bayonne has purchased for some time past the average rate due the defendant and its predecessor has amounted to about $19.50 per million gallons. This figure is by no means accurate, but has been assumed for the sake of convenience at the final hearing. In 1895 the East Jersey Water Company entered into another contract with the New York and New Jersey Water Company to furnish the latter with water for sale to Bayonne and others, in return for which the East Jersey Water Company was to receive thirty-five per cent. of the gross receipts paid by Bayonne to the New York and New Jersey Water Company for such supply.
The two water companies in 1902 made still another contract, under the terms of which the New York and New Jersey Water Company was permitted to sell the water furnished by the East Jersey Water Company to any customer it could obtain within the territorial limits of Hudson county. For this supply of water delivered to customers other than Bayonne the East Jersey was to be paid by the New York and New Jersey Water Company $30 per million gallons, plus one-half of any amount above that sum charged to the consumer by the New York and New Jersey Water Company. Under this contract, the New York and New Jersey Water Company *Page 176 
entered into relations with a number of corporations doing business outside of Bayonne.
The rights of the New York and New Jersey Water Company, under all of these contracts, passed to Bayonne under the assignment of 1918, so that from that time forward Bayonne stood in the shoes of the New York and New Jersey Water Company for all purposes of this suit.
While the complainant was considering the advisability of purchasing the rights of the last-named water company, and before the execution of the contract of 1918, it occurred to someone that the position of Bayonne would be a sorry one if, after concluding its bargain with the New York and New Jersey Water Company, the East Jersey Water Company, controlling the supply, should decline to do business with the city, or, perhaps, demand an exorbitant price for its water. To guard against such a contingency a gentleman named Reichhelm, who had been officially appointed as an appraiser by the governing body of Bayonne, accompanied by one Annett, who had actively lent his services to the public officers of Bayonne in the serious attempt to improve the service of supplying water to its people, called upon one of the vice-presidents of the East Jersey Water Company and sought an expression of the intention of that company in regard to the premises just mentioned. The vice-president felt himself to be unauthorized to bind the corporation, but promised to take the matter up and have an authoritative statement made by someone in authority. Shortly thereafter, on January 6th, 1917, the president of the company wrote to Reichhelm as follows:
"You asked whether the East Jersey Water Company would be willing to sell water to Bayonne, if for any reason they had no contract relations with the New York and New Jersey Water Company.
"We have no desire to in any way interfere with the relations between the New York and New Jersey Water Company and the city of Bayonne, but, of course, we are in the water business, and it would be manifestly against our interest if Bayonne should seek a water supply elsewhere; and, therefore, I think I am justified in saying that if the relations of Bayonne with the New York and New Jersey Water Company were severed [which would, of course, relieve our *Page 177 
company from its obligations to the New York and New Jersey Water Company in respect to the supply of water to the city of Bayonne], the East Jersey Water Company would be willing, in that event, to contract with Bayonne for water at the same price we are now receiving from the New York and New Jersey Water Company; the water to be taken at the same location.
 Yours very truly, EDMUND LEB. GARDNER."
The contents of this letter was delivered to Bayonne's governing body by Reichhelm, and the members thereof were thereby, in large part, persuaded to vote for the execution of the contract of 1918. As a part of the entire transaction, Bayonne found it necessary to construct a new water main at a cost of approximately $2,000,000, bringing its investment up to $4,000,000, in reliance upon the representation of the foregoing letter.
In 1922, after the last-mentioned contract had been executed, the East Jersey Water Company and four other similar companies filed with the board of public utilities commissioners a schedule of proposed new rates to be charged their customers for water supplied. As the result of the hearing thus precipitated, that board made an order fixing the sum of $78 per million gallons as the rate to be paid by Bayonne to the East Jersey Water Company, notwithstanding the contract under which the city had previously secured its water at an average cost of about $19.50 per million gallons. This order was affirmed on certiorari by the supreme court, and that judgment, in turn, affirmed by the court of errors and appeals.
If such a course of dealing had existed between two private individuals with regard to some ordinary commodity of commerce, it would appear to be a typical case for relief in this court.
"Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who, on his part, acquires some corresponding right, either of property, of contract, or of remedy." Pom. Eq. Jur.
§ 804. *Page 178 
It is unquestionably true that Bayonne disbursed $4,000,000 upon a project that would never have been consummated but for the conclusion that the highest officer of the East Jersey Water Company intended should be drawn from his letter of January 6th, 1917. I am not impressed by the argument of defendant's counsel that Gardner only intended to say and convey to the board of commissioners of Bayonne that the company would be willing to treat or contract with the complainant for the continuation of a supply of water. The strict literal interpretation of the language of the letter might, to some extent, support an argument to that effect, but when the surrounding circumstances are considered, as well as the phrase "same price we are now receiving," it is apparent that he either intentionally or carelessly led the municipality into a false belief that in considering the financial aspect of the then pending transaction they might count upon a continuing cost for the water necessary at a rate of about $19.50 for a long period of time, provided they continued to consume not less than 15,000,000 gallons per day; and it is, of course, common knowledge that the consumption of water in all cities such as Bayonne is increasing rapidly, and will probably never be decreased below the amount that was used eight years ago.
Unfortunate and hard as the situation of Bayonne is, however, I do not see how relief can be afforded it. The elaborate collection of authorities in the brief of defendant's counsel has convinced me that Bayonne is remediless so far as any constitutional guarantee is concerned. The courts of this state, of the United States and of many of our sister states have repeatedly and consistently placed the consideration of contracts with public utility bodies upon an entirely different footing than those of other contracts protected by section 10, paragraph 1 of article 1 of the United States constitution, or thefourteenth amendment thereof. It appears to be the consensus of the courts, with negligible exceptions, that under the police power of the state comparative convenience compels a disregard of such private rights in favor of the greater importance of securing to all members of the community fair treatment with regard to rates to be paid for necessary commodities *Page 179 
and services dealt in by public utilities. The establishing and enforcing of a preferential rate in favor of one or more individuals would, of necessity, require the utility, if it is to live, charging correspondingly unfair, higher rates to others to offset the losses so sustained. This defense interposed by the defendant is fortified by innumerable decisions, among which may be mentioned: Chicago, Burl. and Quincy Railroad v. Nebraska,170 U.S. 57; Louisville and Nashville Railroad Co. v. Mottley,219 U.S. 467; Producers Transportation Co. v. RailroadCommission, 251 U.S. 228; Union Dry Goods Co. v. Georgia,248 U.S. 372; Cortelyou v. Anderson, 73 N.J. Law 427; AtlanticCoast, c., Co. v. Board of Public Utility Commissioners,89 N.J. Law 407; reversed in 92 N.J. Law 168; CollingswoodSewerage Co. v. Collingswood, 91 N.J. Law 20; affirmed in aper curiam opinion in 92 N.J. Law 509; Edison Storage BatteryCo. v. Public Utility Board, 93 N.J. Law 301.
With this position the complainant does not quarrel, but insists that the application of the doctrine of estoppel is a different thing. That avenue, too, appears to have been closed by equally compelling authorities. In Louisville and NashvilleRailroad Co. v. Mottley, supra, the plaintiffs were injured by the defendant's railroad. They subsequently compromised their claim for damages in consideration of an agreement by the railroad company to provide them each with free passes over its road and branches during their lives. This agreement was carried out by the railroad company over a period of years, until the adoption of the Interstate Commerce act by the national congress. Although this contract was made many years before the passage of the act of June 29th, 1906, which makes it very similar to the present situation, nevertheless, Mr. Justice Harlan, delivering the unanimous opinion of the supreme court of the United States, said: "We forbear any further citation of authorities. They are numerous and are all one way. They support the view that, as the contract in question would have been illegal if made after the passage of the Commerce act, it cannot now be enforced against the railroad company, even though valid when *Page 180 
made. If that principle be not sound, the result would be that individuals and corporations could, by contracts between themselves, in anticipation of legislation, render of no avail the exercise by congress, to the full extent authorized by the constitution, of its power to regulate commerce. No power of congress can be thus restricted. The mischief that would result from a different interpretation of the constitution will be readily perceived."
In Manigault v. Springs, 199 U.S. 473, the defendants maintained that the adoption of an act by the legislature of South Carolina impaired a contract into which they had entered several years before. Nevertheless, the court said, at page 480 of the opinion: "It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the state from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. This power, which, in its various ramifications, is known as the police power, is an exercise of the sovereign right of the government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals. Familiar instances of this are where parties enter into contracts, perfectly lawful at the time, to sell liquor, operate a brewery or distillery, or carry on a lottery, all of which are subject to impairment by a change of policy on the part of the state, prohibiting the establishment or continuance of such traffic; in other words, that parties, by entering into contracts, may not estop the legislature from enacting laws intended for the public good."
If the state may pass such laws, I am at a loss to see how this court, with all its broad powers, may nullify such statutes because one party has been misled and thereby finds itself in a worse position than would otherwise have been its lot. When a party embarks upon an undertaking as the result of transactions, contracts or representations with or by a public utility, he is bound by the power of the state, whether yet *Page 181 
expressed in a statute or not. This policy which, in the language of Mr. Justice Brown in the Manigault Case, "is the settled law" of the United States supreme court, entitled, as Mr. Justice Swayze said in Atlantic Coast, c., Railway Co. v. Board ofPublic Utility Commissioners, supra, to speak the last word in causes of this sort, precludes me from advising any relief to the complainant upon this phase of the case.
Some faint argument is attempted in the complainant's brief, to the effect that what I have said should not operate in the case at bar, because the East Jersey Water Company was not, in fact, a public utility. I am at a loss to understand how I am to say so, in view of the opinion of the court of errors and appeals to the contrary in East Jersey Water Co. v. Board of Public UtilityCommissioners, 98 N.J. Law 449.
The next position taken by the complainant is, that since the order of the public utility board the defendant has disposed of a considerable percentage of its property, and that, consequently, a revision of its rates should now be made. I should have said, in the discussion of the facts, that when the application was made in 1922 to the board of public utility commissioners for an increase in the rates charged to consumers by the East Jersey Water Company and four others, these five corporations were co-operating in the service of a large area of northern New Jersey. Subsequently, they were consolidated into the defendant, the Passaic Consolidated Water Company. In the proceedings before the board the position was assumed and argued on behalf of the water companies that by reason of common holdings, such as a pumping station, a filtration plant, storage basin, and transmission system, the system of the combined companies was one entity, as, in fact, it subsequently became upon the consolidation just mentioned. After the decision of the board had been rendered, the defendant sold to the town of Montclair so much of its system as lay therein. For this, it was paid $1,700,000. Of this amount, $500,000 were used for extinguishing bonds that were a lien upon the property sold, and the remaining $1,200,000 divided as a dividend among the stockholders of the defendant company. Consequently, *Page 182 
it is argued that there should now be a different rate established because the utility board based the rate upon the value of the company's assets, and those assets have been reduced from $11,500,000 to $9,800,000. Whether this transaction would affect the rate imposed upon Bayonne I cannot, with any confidence, say, because no evidence was given upon the subject. But that inquiry should be made by the board, and not by this court. While it is not to be presumed that the legislature intended to invade the constitutional jurisdiction of this court in the passage of the Public Utility act, consideration must not be lost of the advisability of leaving to the attention of the utility board rate-making proceedings for the conduct and decision of which it has been abundantly and elaborately supplied by appropriations with the necessary assistants. I do not mean to say that there is no inherent jurisdiction in the court of chancery to fix rates under certain circumstances where jurisdiction of a cause is obtained under one or more of the well-established principles of equitable jurisprudence; and it may be that, under our ideas of justice, a case could arise in which a rate for some public utility ought to be made by this court, but in the present instance we have a typical contest between a utility corporation and one of its customers, as to what the latter should pay for the service performed. It would be a severe burden upon the court of chancery if, in every such dispute where the same could be coupled up with some equitable doctrine, the parties might come into this court with their respective arrays of experts and seek to have the court of chancery exercise the function of a rate-fixing tribunal.
Neither does it appear that the defendant should be longer enjoined from proceeding with its action at law for the collection of back differences between the rate established in the contract of 1894 and that fixed by the public utility board in 1923. The prosecution of this action has been stayed by an interlocutory injunction which was granted on condition that the defendant therein would withdraw its answer if unsuccessful in this litigation. In 1925, after the court of errors and appeals had affirmed the judgment of the supreme court confirming the order of the public utility board, the complainant *Page 183 
filed a petition with the last-mentioned body, praying a rehearing because of the Montclair sale. The decision of the board was that this was not the proper subject for a rehearing, but intimating that the practice requires an original petition, instituting an entirely separate proceeding. This was a clear indication to the complainant to thresh out the question thus presented. This course of action has always been available to the city, and it cannot now complain that it will be placed under a heavier burden than it thinks it should sustain while it seeks the remedy held out to it, and which it has not thus far pursued.
I do not consider the opinion of Vice-Chancellor Lane, inBayonne v. East Jersey Water Co., 108 Atl. Rep. 121, of any assistance in the case at bar. In the former case the parties jointly submitted to him the contracts underlying the present case, and sought an exposition of their respective rights therein under the seventh section of the Chancery act of 1915. Not a word appears in the opinion to show that the vice-chancellor considered the questions raised in the case sub judice, and it is not to be presumed that he would have disregarded questions of such great moment had they been submitted to him. He, of course, decided only those questions which were presented.
Neither can I follow the complainant in its argument as to the effect of the so-called pumping contract. It contemplated service to it, as a member of the general public, by a public utility corporation, upon which it was entitled to no preference of rates at the expense of other members of the public served by the same concern.
In view of what has been said, other matters argued by the respective counsel call for no determination. I will advise a decree dismissing the bill, which will necessarily carry with it a dissolution of the temporary injunction; but, of course, I will not leave the citizens of Bayonne at the mercy of the defendant, and will, therefore, stay the effect of the decree pending the determination of the appeal, so far as the threat of the defendant is concerned, in its letter of June 1st, 1925, namely, the discontinuance of Bayonne's supply of water for non-payment of current charges. *Page 184