Shipman *v.* Shipman.

---

HENRY SHIPMAN et al.

*v.*

WILLIAM C. SHIPMAN et al.

[Filed January 5th, 1904.]

1. The only ground upon which a parol agreement for the conveyance of land can be enforced or recognized by a court of equity is that of part performance.

2. A mere payment of part of the consideration of the verbal sale of real property is not part performance of the verbal agreement, so as to call for its enforcement by a court of equity.

3. Where a tenant in common has in good faith put improvements upon the common property for the purpose of improving it, and not for the purpose of embarrassing his co-tenants, or encumbering their estates, or hindering partition, he is entitled to be compensated in an equitable partition; nor does the fact that the improvements were so placed by a tenant in common in remainder during the existence of a preceding life estate change the rule.

Shipman *v.* Shipman.

4. In a suit for partition a tenant in common is not entitled to have a sum charged upon the property for his services as attorney for the tenants, where no contract was made for remuneration for such services, and they were rendered by him as one member for all the members of the same family.

On bill for partition:

The bill is filed by three of the four children of Jesse B. Shipman to partition a farm in Warren county, owned at the time of his death by Jesse B. Shipman, and devised by him to Ellen, his wife, for life, and after her death to his four children—Henry, George S., William C. and Mary Fox. The widow, Ellen Shipman, died January 4th, 1899.

William C. Shipman, the defendant, filed an answer and an answer by way of cross-bill. He denies that either Henry Shipman or Mary Fox have any equitable interest in the property sought to be partitioned. He admits that the legal title is in the four children, but claims that by a verbal agreement, entered into by the children of Jesse B. Shipman in the spring of 1892, Henry and Mary were to deed over their interests in the farm (the property sought to be partitioned) upon the death of their mother, the life tenant. He asserts that in pursuance of such an agreement bonds were executed by himself and by George to Henry Shipman and Mary Fox, in consideration of this agreement to convey.

Apart from this defence to the suit for partition, the defendant also claims that in 1886 a barn upon this farm was destroyed by fire, and that he and his brother George erected a new barn upon the property, at a cost of about $4,000, having received as insurance money for the destruction of the old barn $1,100. He asks that if partition be made the amount of money expended for this purpose by him shall be allowed to him.

The defendant also asks that the bill be dismissed because this property is deeded to pay the debts of the estate of Jesse B. Shipman, in Pennsylvania. The defendant also asks that in case no agreement for the settlement of the entire estate is found

to exist, then that the services of the defendant on account of the estate may be declared to be a lien upon this property. He also prays that if no equitable title passed from Henry Shipman and Mary Fox to himself and George, by force of the alleged parol agreement, then that a bond given by the defendant to Mary Fox, in consideration of her interest in the farm, may be delivered up to him, and that the amount of a similar bond paid to Henry on account of his interest in the farm may be decreed to be repaid by Henry out of his share of the proceeds of the sale of this property.

The answer of the complainants to the cross-bill denies that any contract was made to sell the interest of Henry Shipman and Mary Fox in the farm to William and George Shipman, and their other material allegations in the cross-bill are denied.

*Mr. Irwin W. Schultz,* for the complainants.

*Mr. W. H. Walters,* for the defendants.

REED, V. C.

The first point raised by the defendant William C. Shipman in opposition of the right of the complainants to a partition, is unsupported by the testimony. If it be admitted that an agreement was entered into between the four devisees that the individual interests of Henry Shipman and Mary Fox should be conveyed to William C. and George Shipman, such agreement, admittedly, rests entirely in parol. The only ground, therefore, upon which it could be enforced or recognized by a court of equity would be upon proof that there had been a part performance of the agreement. There is no evidence of performance save the giving of the two bonds, and the payment of one of them, which bonds, it is alleged, were given for the interest of the obligees in the farm. In respect to the occupation of the farm by a tenant who was thereon at the time of the death of the life tenant, and thereafter, nothing appears to show that he was the tenant of George and William, after the death of the widow, rather than the tenant of the four devisees of the

remainder.   No new lease was made by William and George. William dealt with the property after, as he had before, the death of the widow.   His failure to account to the other devisees for the product of the farm after the death of the widow has no significance, inasmuch as he failed to account to George, whom he admits retained an interest in the farm.   Besides, both George and Henry received from time to time small articles, the product of the farm, after the death of the widow.   The claim of part performance, therefore, must rest entirely upon the execution of the bonds and the payment of one of them.   But a mere payment of part of the consideration of the verbal sale of real property is not part performance of the verbal agreement. *Clinan* v. *Cooke, 1 Sch. & Lef. 22; 6 Eng. Rul. Cas. 721; Cole* v. *Potts, 2 Stock. 67; Campbell* v. *Campbell, 3 Stock. 268; Nibert* v. *Baghurst, 2 Dick. Ch. Rep. 201, 206; Lippincott* v. *Bridgewater, 10 Dick. Ch. Rep. 208, 210.*   There is therefore nothing to show that the title, both legal and equitable, is not in the four parties to the suit, as alleged in the bill.   There must therefore be a partition.

The defendant, however, insists that he has an equity in the property, which should be protected in these proceedings.   This equity, he insists, arose from his expenditure of money in rebuilding the barn which was destroyed by fire during the existence of the term of the life tenant.

If it be proved that the defendant did expend his own money, in excess of what he received from the insurance company and in excess of what the other tenants expended, either in money or labor, it follows that he should be repaid in these proceedings.

The equitable rule is entirely settled that when a tenant in common has in good faith put improvements upon the common property—when the improvements were made honestly, for the purpose of improving the property, and not for the purpose of embarrassing his co-tenants or encumbering their estates, or hindering partition—he is entitled, in some way, to be compensated in an equitable partition.   *Hall* v. *Piddock, 6 C. E. Gr. 311; Atha* v. *Jewell, 6 Stew. Eq. 417.*

Nor does it matter that the improvements were so placed by a

tenant in common in remainder, during the existence of a preceding life estate. *Brookfield* v. *Williams, 1 Gr. Ch. 341.*

The testimony, however, fails to support the defendant's claim. It is entirely clear that instead of the new barn costing $3,900 or $4,000, it did not cost one-half that sum. Indeed, it is not shown that it cost William C. Shipman any more, if as much, than the amount of insurance money that came into his hands. The entire amount of insurance money he received was $1,650. The carpenter's contract for building the barn from the foundation up was $1,280, and the mason-work did not cost more than $150. The stones were mostly got from the ruins of the old barn. The paint and the painting George says he paid for, but what it cost does not appear. There were also some repairs made in 1893, the cost of which amounted to about $121. The carting incident to this reparation was done by the horses of George and William's livery-stable, and no charge was made for them. So it does not appear that the moneys expended by William C. were in excess of the amount received by him.

The next insistence of the defendant is that Henry shall be decreed to repay the sum of $1,250 and interest, being the amount of the bond paid by William C. to Henry, and that Mary Fox may be decreed to deliver to William a similar bond, received by her from William.

In suits for specific performance which have failed because the contract was not in writing, it has been decreed that money paid by the complainant upon the contract should be returned. The cross-bill in this suit is, in one of its features, in substance, a bill for specific performance.

Whether the payments mentioned were given for an interest in the farm now sought to be divided is a question which stirs up transactions between the parties running for a period of twenty years.

Jesse B. Shipman, the testator, died October 18th, 1883. He died owning a livery-stable in Easton, and the horses and carriages therein, a house on Third street, Easton, and the farm in question, in New Jersey. He owed his son George about $5,000 and his son Henry about the same amount. He also

owed two notes in bank of about $1,700 and $1,500, respectively, and a debt to Philip Shipman of about $1,800 and some smaller debts. There was no inventory filed and no judicial settlement of the estate. George, who had been employed in the livery business during the life of his father, continued this business after his death. He continued it, as William C. insists, as a partner with him (William C.) up to 1892; but, as George insists, they ran the business practically for the estate. The bank account of the father was changed into the name of Helen, the widow, and so remained until 1886, when it was changed into the name of George. William, who was and is a lawyer, and George gave new notes for the notes of the testator in bank, and gradually paid off the outstanding debts against the testator. These notes were paid through the bank account, kept as already mentioned, and William says that he paid into this account, for the purpose of paying debts, about $5,000, so that, in 1886, the estate owed him the same amount that it had owed George and Henry. As already mentioned, William claims that he was a partner with George in the livery business. He says that they estimated the value of the livery-stable at $10,000; that by way of 'rent they made allowances to the widow, paid taxes, &c., and the livery business was conducted in the stable up to 1892. After that year, William claims that there was a settlement agreed to between the four devisees. He says that about June 1st, 1886, he had appraised the property of which his father died seized as follows: The livery-stable at $10,000, the stock in the stable at $2,500, the Third street residence at $5,000 and the farm at $10,000. He says that at a meeting in 1886 he exhibited a statement of what he and George had paid in on account of the debts of the estate, which amounted to $12,000, or $7,000 in excess of the $5,000 he had paid in. What the debts were that made up the excess of $7,000 does not appear.

Affairs remained thus until 1892, when William endeavored to have a settlement of the estate. The proposed settlement he claims to have been upon the following basis: That the amount of property in excess of the amount of debts paid was $10,000,

making $2,500 each to be divided between the devisees, and that William and George should each give a bond of $1,250 each to Mary and Henry for their interests in the residue. At that time a deed was prepared conveying to Henry and George the title to the livery-stable, but this deed was not delivered. An arrangement was made, however, by which a joint note was executed to William, by Henry and George, for the sum of $5,000. This note, as William insists, was given for a one-half interest in the livery business, which he sold to George and Henry; Henry at that time entering this business with George as a partner. The proposed arrangement for the disposition of all the property of the estate was not consummated, and the deeds and bonds prepared were not delivered, but remained in the hands of William until 1896 or 1897. The bonds executed in 1892 seem to have been one by Mary Fox to Henry Shipman, another by George Shipman to Henry Shipman, and still another by William C. Shipman to Henry Shipman; but how these bonds were to serve in carrying out the settlement upon the basis mentioned is not clearly explained. No further meeting of all the devisees afterwards occurred. It appears that in March, 1896, a deed was made to William C. Shipman, by the three other devisees, of the Third street property. Although the deed appears to have been made and acknowledged upon the date mentioned, William insists that it was not signed by Mr. and Mrs. Fox until 1897. At the time the deed was delivered a bond was executed by William C. Shipman and delivered to Mary Fox, conditioned for the payment to her of the sum of $1,250, that being one-quarter of the appraised value of this property, which was $5,000. At the same time there was delivered to Henry Shipman the bond made to him by William C. Shipman in 1892, which from that time had remained in the hands of William C. Shipman. These are the two bonds which William says were given for the interests of Mary and Henry in the farm, which bonds—one of which he asks to be delivered up for cancellation and the money paid upon the other—he wishes Henry to return.

Mr. Lehr, a lawyer who acted for Mrs. Fox in the transaction in which these bonds were delivered, says that they were given for Mary Fox's and Henry Shipman's each one-quarter interest of the Third street property. He also says that as a part of the transaction William C. Shipman and Mary Fox made a deed, dated March 6th, 1896, to Henry Shipman and George Shipman, for the livery-stable property for $10,000; that George gave a bond to Mary Fox, dated May 18th, 1897, and was to give a similar bond to Henry Shipman, for each of their one-quarter interests in the stable, but that no bonds were passed between William and Henry, for they would have been of equal amounts, and so would have offset each other. Mr. Lehr says that the farm was not mentioned in the transaction, and George and Henry Shipman and Mary Fox also say that the farm was not considered in the arrangement.

On the other hand, William C. Shipman insists that George and Henry Shipman received the livery business in payment of what the estate owed them, viz., $5,000 each, and that he (William C. Shipman) took the Third street property for what he had paid into the estate to liquidate debts, namely, $5,000; that the farm only remained, which was valued at $10,000, and that the bonds were given by him and George to pay Mary Fox and Henry Shipman for their interests in the farm.

Now, there is not a scrap of writing to throw light upon the accuracy of these conflicting assertions, aside from the language of the bonds executed in 1897, each of which recite that this "obligation is given as payment for real estate transferred in the settlement of said testator's estate." The only property then transferred were the Third street dwelling and the livery-stable property.

The bonds executed in 1892, but delivered in 1897, recite that the bond was "given in the settlement of the said testator's estate." But these bonds were drawn long before the final transaction, and in view of an arrangement which was never consented to by the complainants. If the farm was paid for by these bonds in 1897, when deeds were passed for the Third street property and the livery-stable property, why was not a deed for

Mary Fox's and Henry Shipman's half interest in the farm also executed, or at least a written agreement to convey Mary Fox's and Henry Shipman's interest to the two other devisees? William C. Shipman insists that the otherwise inequality of the division of the estate after these bonds were left outstanding is so glaring that it supports the accuracy of his contention. His position is, as already stated, that Henry Shipman was paid for his debt, and George for his, by the conveying to them of the livery-stable property; that now Henry has, in addition to the payment of his debts, two bonds, aggregating $2,500; that George is liable upon one of these bonds, as well as upon a bond to Henry, and so he is out $2,500; that he (William) has only received $2,500, one-half the value of the Third street property, deducting from its value of $5,000 the bonds which he gave to Mary Fox and Henry Shipman, amounting to $2,500. He insists that if George and he have the farm, and it was worth the amount at which it was valued, namely, $10,000, then each would get one-half of the share of Mary Fox and Henry Shipman in the farm, or each would get $2,500, which would secure equality in the final division of the estate; that if they are deprived of such interest in the farm, then the only way in which equality can be secured is by the cancellation of the bonds held by Henry Shipman and Mary Fox.

There is, however, this fact in the case to be considered: George, or George and William, as already remarked, assumed the livery business, taking into possession all the stock of horses and carriages, and so forth, and used the building to run the business from 1883 to 1892. Then William took the joint note of Henry and George for $5,000, which was given, as William C. Shipman insists, for his interest in the business. Now, what the value of this stock was at the time of the testator's death does not appear, aside from the statement of William C. Shipman that three years thereafter he appraised its value at $2,500, and that in 1892 its value had run up to the sum of $10,000. During all this period Helen was the life tenant, and George Shipman and William C. Shipman advised and directed the business and had taken hold and continued the business for

the benefit of the widow and of the estate. In 1892, therefore, William C. Shipman took out of the business as much as he had put in for the payment of debts, and George retained, presumably, as much, so that it may be that in 1897 William C. Shipman told Mr. Lehr that the only creditor was Henry, and that both William and George at that time so regarded the situation. If this was the situation, then the transaction in which the bonds were given is explicable on the theory that they were given in the settlement of the sale of the Third street property and the livery-stable property.

While I concede that William C. Shipman, who is a lawyer and who conceived the arrangement to convey the properties, would be more likely to be accurate than any other one of the devisees, nevertheless, in view of the admitted fact that, originally, Mrs. Fox was to have had the Third street property, and the further fact that no new meeting of the devisees occurred after 1892, and the still further fact that George Shipman, who was equally interested with William C. Shipman to support his view respecting the arrangement proposed in 1892, denies that he was to have for his bond any interest in the farm, and in view of the fact of the non-existence of any writing to show that the bonds were given for such interest, I must regard it as not proven that the two bonds of Henry Shipman and Mary Fox were executed by William C. Shipman as a consideration for their one-half interest in the farm property. Nor can I perceive how any sum can be charged upon the farm for the services of William C. Shipman as attorney for the devisees. No contract was made for remuneration for such services, and they seem to have been rendered by one for all the members of the same family.

I will advise a decree that the farm be sold, as prayed for in the bill, and that the relief asked for in the cross-bill be refused.