Previous proceedings in this cause appear from recitals in my former opinion filed herein in December, 1929, in connection with petitions to open and amend the final decree and for other relief, not yet, but to be reported in conjunction with these conclusions. In that opinion I held that all moneys arising from the foreclosure sale, except such amounts as were found to be due on the first and second mortgages, should be paid into court as surplus money in order that the respective rights of the parties defendant, including the infant defendants, could be fixed therein and the moneys distributed amongst those entitled thereto. Upon application for the entry of an order in accordance with my former conclusions, objections to its form were interposed, and application was made by some of the parties for a determination of the rights of the respective parties in the fund to be paid into court prior to its actual deposit there. In order that the court might better decide the proper form of the proposed order, and might at the same time determine the rights of *Page 588 
the respective parties in the fund to be so paid into court, the actual entry of the order was withheld pending the taking of testimony and the submission by the respective parties of such evidence as they deemed advisable in order that a complete disposition of all the matters in controversy might be had in the one proceeding. An order directing the payment into court of the amount of the surplus moneys as now determined may now be enterednunc pro tunc. The rights of the respective parties to that fund will be determined as on application for distribution of surplus moneys arising from the foreclosure sale. Upon such an application any and all controversies between defendants respecting their rights in such surplus moneys may be settled and determined. Chancery Rule 187. Applications for distribution of surplus moneys may be presented at any time after sale and before the moneys are actually paid into court. Chancery Rule 219.
Petitions to open and amend the final decree were filed by Jeannette Glaser, an infant defendant, who is still an infant; Max Glaser, an infant defendant who attained his majority on January 27th, 1928; Long Branch Banking Company, Citizens National Bank of Long Branch and Southern Lumber Company, subsequent encumbrancer defendants. The petitions of Jeannette and Max Glaser were filed in August, 1929. Upon the return of orders to show cause issued on the petitions of the subsequent encumbrancer defendants, counsel for the infant defendant-petitioners challenged the jurisdiction of the court to consider the petitions of the subsequent encumbrancer defendants on the ground that they were bound by the former proceedings, however erroneous, because they had accepted the benefits of the decree and, it was claimed, were, therefore, estopped to deny its validity and correctness. Upon this ground they, together with counsel for the widow, refused to answer the petitions or the orders to show cause issued thereon. Later, after my conclusions had been filed and the proposed order pursuant thereto was presented to the court, I announced that before the entry of the order, evidence relative to the rights of the respective parties would be received at a hearing on a day *Page 589 
then and there fixed, and suggested that all counsel, by stipulation, consent to such proceedings, and that at that hearing the dower right of the widow would be admeasured and assigned and the rights of the infants and other parties in the fund to be paid into court would be then determined.
It was assumed by the court that pending such hearing a written stipulation would be entered into by the various solicitors, but this was not done, and on the day fixed for the hearing all parties with their respective counsel appeared and the solicitors of the infant defendants objected to any proceedings or any hearing except upon the infants' petitions, and claimed not to have theretofore stipulated in open court to the proposed hearing and the determination of the rights of the various parties in this proceeding. The court's recollection was to the contrary, and that recollection was confirmed by all counsel except counsel for the two infant defendants and the widow. I considered the previous stipulation in open court as binding upon all parties notwithstanding no record thereof was made, and overruled all objections to proceeding with the hearing. That stipulation I did not consider prejudicial to the rights of the infant defendants and I know of no rule which would prevent these solicitors "from assenting to such arrangements as will facilitate the determination of the case in which the rights of the infants are involved." Caruso v. Caruso, 101 N.J. Eq. 350.
Notwithstanding the refusal of counsel for the infant defendants to answer the petitions of other defendants, and to submit any evidence except the file in the foreclosure suit, it should be noted that all during the course of the many hearings in this proceeding counsel for the infants sat beside counsel for the widow, and while not actually examining or cross-examining any witnesses, or offering any testimony themselves, they actually participated in the hearings and in the examination and cross-examination of witnesses through counsel for the widow, and they are, in my judgment, by such participation, as much bound by the proceedings as they would have been had they personally examined and cross-examined witnesses who were sworn. Aside from that, at the *Page 590 
conclusion of the hearings the court offered counsel for the infant defendants and all parties to the suit an opportunity to file such pleadings and answers to the petitions already filed, and to frame any issues by such pleadings which they desired to frame, and to submit any evidence respecting such issues which they desired or deemed advisable to submit, but the infants' counsel refused to avail themselves of this offer.
"A foreclosure suit cannot be said to have terminated until the surplus moneys have been disposed of in that suit. The court has not only the power, but it is its duty in that action to provide for the equitable disposition of the surplus money. The judgment of foreclosure and sale does not terminate the suit or deprive the court of the power to make other orders in it. The equities of lienors subsequent to the mortgage foreclosed are just as much before the court, and as much the objects of its care as those of the mortgage primarily foreclosed." Thom. Mort. 379.
During the course of the hearings in this proceeding, errors in the master's report, in the final decree, and in the fierifacias, in addition to those errors which previously appeared and were mentioned in my former conclusions, were shown to exist and those errors should now be corrected. The master's report and the final decree found that the mortgages of the two banks and the lumber company were liens upon the "undivided one-third interest of Harry Glaser and the dower interest of Sarah Glaser." This was an error. They were a lien, if a lien at all, upon whatever interest these parties had in the premises. The mortgage so provided, their exact interest not being specified therein. It was also claimed on behalf of the infants and the widow, that there was an error in the amount found to be due to the complainant on his mortgage; but at the hearing counsel waived the right to question this amount and stood on the record as it appeared at that time. The decree having been opened it is the right of the infant defendant Jeannette Glaser, at least, to have the court fix the true amount due upon the complainant's mortgage if an error was committed, and this right is one which counsel for the infants cannot waive. *Page 591 
Procedure by petition to open a final decree and order to show cause issued thereon is the modern procedure recognized in this state as a substitute for the procedure by bill of review, or by bill in the nature of bill of review, and although our practice still recognizes such bills, the practice of procedure by petition and order to show cause has been recognized in this state for more than a century. Miller v. Rushforth, 4 N.J. Eq. 174; Watkinson v. Watkinson, 68 N.J. Eq. 632; Cook v.Weigley, 69 N.J. Eq. 836; Sparks v. Fortescue, 73 N.J. Eq. 251; Boyer v. Boyer, 77 N.J. Eq. 144; Jones v. Read-Jones,84 N.J. Eq. 479; In re Roberson, 95 N.J. Eq. 672; Mitchell v.Mitchell, 97 N.J. Eq. 298; In re O'Mara, 106 N.J. Eq. 311.
Ordinarily an infant may file a bill of review at any time before he attains his majority, or thereafter, within the time within which he could successfully prosecute an appeal. Fletch.Eq. Pl. Pr. 985 § 926. Time for appeal by the defendant Max Glaser would have expired on January 27th, 1929, which was one year after he attained his majority. Under certain circumstances the chancellor could have extended the time for six months thereafter. 1 Cum. Supp. Comp. Stat. p. 269 § 111. It was one year and eight months after he attained his majority that Max Glaser filed his petition to open the decree. The infants' petitions are based upon the contention that the decree was a fraud on them. Where a decree is opened on the ground of fraud "the court will restore the parties to their former situation whatever their rights may be." 2 Dan. Ch. Pl. Pr. (6th ed.)1584. The opening and amending of a final decree is a matter lying in the discretion of the court. Day v. Allaire, 31 N.J. Eq. 303.
A decree may be opened partially and only for the purpose of permitting a rehearing. Mitchell v. Mitchell,supra. But the court may of its own motion and in the interests of justice open a decree and permit the taking of further testimony in the cause. Kirschbaum v. Kirschbaum, 92 N.J. Eq. 7.
The position taken by counsel for the infant defendants is that the court has the power to open the decree and set aside the previous proceedings only in so far as those proceedings *Page 592 
and the errors complained of were prejudicial to the rights of the infants, but that the court has no right to correct other errors, or to amend the decree or proceedings in any other particular which has resulted in injury to any parties other than the infants. This is a rather anomalous suggestion and I cannot accede to it. A court of equity upon the opening of a decree, especially where fraud is alleged, as here, may open that decree on terms, and may make any corrections or amendments which are necessary to do complete justice to all parties. "Equity delights to do justice and not by halves." I have no doubt not only of the right, but of the duty, of this court to now determine the rights of all of the parties to this proceeding and to correct any error in law or procedure which appears from the record, or the evidence which has been submitted.
As I have already suggested, the rights of the respective parties will be determined as on an application for distribution of surplus moneys paid into court after foreclosure sale.
The master's report should have recommended a sale to make the amount due on the first and second mortgages and the payment of the surplus, if any, into court to abide the further decree of the court. What should have been done will be considered as having been done for the purpose of this proceeding.
Surplus moneys arising on foreclosure stand in place of the land itself as to the liens thereon or vested rights therein.Servis v. Dorn, 76 N.J. Eq. 241; Zelley v. Zelley, 101 N.J. Eq. 37.
The same rule applies as well to land sold by order of the orphans court for payment of debts, or on partition. The proceeds retain the character of real estate for the purposes of succession. Oberly v. Lerch, 18 N.J. Eq. 346. The theory upon which such surplus proceeds are held to be land is that the surplus usually arises because more land is sold than is necessary, in one case, to pay the debts of decedent; in another (foreclosure), than is necessary to satisfy the mortgage debt; and in partition, because the land is impossible of division and for practical purposes it has been converted into money. But in each case the money *Page 593 
stands for the land and the rights therein are determined as though the court were dealing with the land itself. Upon an application for distribution of such surplus moneys, the division amongst those entitled is, in effect, an equitable partition of the land for which the money stands. The excess, though in the form of money, remains, as before, impressed with the character of the land. Cooke v. Dealey, 22 Beav. 196. Such money passes by succession on "the principle that money impressed with the character of land remains such until it is accepted as money by its absolute owner of sufficient capacity to make such election." Oberly v. Lerch, supra. An infant is incompetent to elect to change the character of such proceeds. The surplus moneys here involved, therefore, are considered as land and subject to every lien, claim and demand which stood against that land or any interest therein on June 6th, 1927, the date of the foreclosure sale.
Before considering the various questions arising on this proceeding, additional facts established by the evidence submitted at the hearings should be noted. At the time of the death of Simon Glaser he was the owner of certain lands on Atlantic avenue, in the city of Long Branch, on which was an old hotel erected about half a century before and which was obsolete and in a bad state of repair. There were no modern conveniences in the hotel, and the building itself was of very little value. Some witnesses testified that the land was of more value without the hotel than with it. The widow and her children resided in this hotel at the time of Simon Glaser's death, and notwithstanding its dilapidated condition the widow and her adult son Harry operated the hotel until 1922, when it was decided that it was impossible to successfully and profitably operate it any longer and ways and means were sought to erect a new hotel on the premises. At the time of Simon Glaser's death this property was encumbered by two mortgages held by one Dobbins, one of $18,000 and another of $5,500. On July 23d 1920, $1,000 was paid on account of the $5,500 mortgage and later another payment of $400 was made thereon, thereby reducing *Page 594 
the principal of the mortgage to $4,100. Later Long Branch Banking Company purchased this mortgage from the Dobbins estate. The payments on account of principal were made by either Sarah or Harry Glaser. It is certain that the $400 payment was made by Sarah Glaser, the widow, but it is not clear whether Harry or Sarah, or both, made the $1,000 payment. When means were sought for the construction of the new hotel, Harry Glaser, who was the principal actor in the various transactions, and who acted not alone for himself but for his mother, under a power of attorney, consulted with Benjamin P. Morris, the complainant, who had acted as counsel and adviser for Simon Glaser during his lifetime. The two mortgages were then overdue and the Dobbins estate had demanded payment. It was apparent that because of the interest of the two minor children in the property some plan of temporarily financing the building of the proposed hotel would have to be devised and the permanent financing postponed until the new hotel was built. With this end in view Harry Glaser persuaded the complainant to purchase the $18,000 mortgage, and Morris devised a plan of financing which included the purchase of the second mortgage by Long Branch Banking Company. It is admitted by Morris that at the time he purchased the mortgage it was pursuant to an arrangement between him and Harry that it was to be foreclosed for the purpose of eliminating the interest of the infants in the property and thus to facilitate the financing of the new hotel. There is no evidence, however, to indicate that this was with any design or intent to harm the infants or to deprive them eventually of their lawful interest in the property, and such intention is denied by the complainant. It would seem that the proposed foreclosure was intended as much for the benefit of the infants as for anyone else. For some reason or other the mortgage was not immediately foreclosed, but arrangements were made with the two defendant banks for partial financing of the project through the discount of notes of Sarah or Harry Glaser, to the limit of $25,000 at each bank, bearing certain endorsements, and further secured by a *Page 595 
$50,000 collateral mortgage upon the interests of Sarah and Harry Glaser in the premises, the banks to share equally in this security to the extent of $25,000 each. A contract was then entered into with one Wolfson for the erection of the hotel. The new hotel was completed sometime in 1923 at a cost of $135,000. A large portion of the moneys which went into the new structure was advanced by the banks on notes secured by the $50,000 collateral mortgage. The mortgage of the defendant Southern Lumber Company, in the amount of $25,079, was given by Harry and Sarah Glaser to the builder Wolfson, as the final payment on his contract, and he in turn assigned it to Southern Lumber Company in satisfaction of a debt which he owed that company. Part of this debt was incurred for material which went into the new hotel, part of it not. The mortgage itself, however, represented a part of the cost of the improvements to the mortgaged premises. After the completion of the hotel the Glaser family continued to occupy and operate it, and they continued to do so, even after foreclosure and up until after the petitions in this cause were filed. The foreclosure and the sale pursuant thereto appear to have been accomplished in pursuance of the original plan of financing, and the bid of $97,000 made by the complainant at the sale seems to have been based upon a calculation of the amount that would be necessary to satisfy all liens or supposed liens against the premises at that time. After the sale, a building and loan mortgage of $125,000 on the premises was negotiated by Morris, Harry Glaser and Max Glaser. Although Max was still a minor, he participated in these negotiations. It was not until this mortgage had been negotiated that the proceeds of the foreclosure sale were distributed, and they were distributed by Morris, who assumed to act for the sheriff, apparently with his approval, but the money never actually passed through the sheriff's hands. The moneys which were paid to the banks were applied to the reduction or payment of notes held by those banks, the proceeds of which had gone into the construction of the new building. The application of these moneys to those notes was directed and approved by *Page 596 
Harry and Max Glaser and also by Sarah Glaser, who was represented by Harry. Thereafter, and before he became of age, Max Glaser signed a note to the Citizens National Bank for $10,000 and a note for $9,000 which was discounted at Long Branch Banking Company. These notes were to secure moneys advanced for the new building but which were not taken care of out of the proceeds of the foreclosure sale. They were drawn for one month and were thereafter periodically renewed by Max Glaser, as to the $10,000 note, until August 6th, 1929, and as to the $9,000 note, until September 6th, 1929, when that note was paid. The $10,000 note is still unpaid. Harry Glaser died February 17th, 1929. He left a will which has not been probated and by which he left all of his property to his mother, Sarah Glaser. I think there is no doubt but that up until the time of Harry's death there was no thought but that eventually the Glaser family would be able to refinance itself and take back the hotel from the complainant. Morris himself says that that was the intention and that he was always, and still is, ready and willing to turn back the hotel to the Glasers if and when they would make him whole by payment to him of what they owe him in the transaction. He says it was always understood that they were to have the hotel back whenever they paid what was justly due him. There is not the slightest doubt in my mind but that this is the fact. Under these circumstances, it is clear that Morris originally assumed, and still occupies, the position of trustee in purchasing the first mortgage, its foreclosure, and in the purchase of the mortgaged premises at the foreclosure sale. He could undoubtedly be compelled to account as trustee and to convey the property to the Glasers upon their satisfying his just claims, and this he offers to do. But the Glasers do not now want that, and are not seeking the establishment of a trust, nor are they asking that the property be conveyed to them. They seek instead a division of the moneys representing the proceeds of the foreclosure sale in excess of the amount due on the first and second mortgages which had been executed by Simon Glaser in his lifetime, and which, therefore, encumbered *Page 597 
the interest of all Glaser defendants; and they insist that Jeannette and Max Glaser are each entitled to one-third of the surplus subject to the mother's dower right; and Sarah Glaser, the widow, claims to be entitled to dower in all the surplus without any liability as to her share under the mortgage which she executed. It cannot be denied that the value of the mortgaged premises at the time of Simon Glaser's death and immediately preceding the erection of the new hotel was very little, if anything, above the amount of the encumbrances thereon. The value placed upon the property by the various expert witnesses will be hereafter considered, but it is apparent to me that when Simon Glaser died, and up to the time the building of the new hotel was begun, the value of the interest of the infant defendants and the value of the widow's dower in the equity in the mortgaged premises were comparatively small. Whatever value was there at the time of the foreclosure sale and which resulted in a sale at $97,000 was created almost entirely by the building of the new hotel. It would seem that the Glaser defendants are now attempting to ratify everything that was done up to the time of the sale, except that they repudiate any obligations which they may have assumed in those transactions. They seek all the benefits of what has been done, but refuse to assume any of the burdens and deny to the banks and other subsequent encumbrancers security for the moneys which they have advanced to make possible the improvement of their property. As to the infant Jeannette Glaser, she cannot ratify nor can anything that has been done be permitted to prejudice her interest, because she is still an infant; but whether or not her rights have been prejudiced depends entirely upon the value of those rights before the new hotel was built as compared with those rights at the time of the foreclosure sale. It is conceded by the banks and by the lumber company that when they took their mortgages they knew that they purported to cover only the interests of Sarah and Harry Glaser and that is all they now ask; but they insist that the value of the interest of Sarah and Harry Glaser is the original value plus the additional *Page 598 
value by reason of the improvements to the property made by Harry and Sarah Glaser, on the theory that this enhanced value is the result of expenditures made by Harry Glaser, a co-tenant, or by Sarah Glaser, the dowress, and that under the familiar rule applied in partition under like circumstances (30 Cyc. 234) the enhanced value of the share or interest of Harry or Sarah Glaser in the property should be applied to the satisfaction of the mortgages; and further, that as to Max Glaser, he is now estopped from making any claim against the surplus moneys because of his acquiescence in what was done, and his approval and ratification of everything that was done after he attained his majority. On behalf of the infant defendants, it is claimed that the rule in partition has no application here because this is a foreclosure proceeding, and that only Harry Glaser or Sarah Glaser could advance such a claim against the infants' interests, and that they have not done so. That, as to Sarah Glaser, her mortgage is absolutely void because her interest in the premises was not such, at the time the mortgage was executed, as could be mortgaged or conveyed.
I will consider the various issues in the following order:
1. Amount due on the first mortgage.
2. Interest of Jeannette Glaser in the surplus money.
3. Interest of Max Glaser therein.
4. Interest of Harry Glaser therein.
5. Interest of Sarah Glaser therein.
6. Validity and effect of Sarah Glaser's mortgage.
 1. AMOUNT DUE ON THE FIRST MORTGAGE.
Before this mortgage was taken over by Mr. Morris a fire occurred which damaged the hotel building and out of the insurance paid on account of the fire loss several checks of different fire insurance companies, aggregating $3,554.50 and drawn to the order of the estate of Simon Glaser and the Dobbins estate, were delivered to Mrs. Glaser. She endorsed them as administratrix of the estate of Simon Glaser and delivered them to Morris, who sent them, together with *Page 599 
his own check for $14,745.50, to the attorneys for the Dobbins estate and received in return an assignment of the $18,000 mortgage. The insurance company checks had not then been endorsed by the Dobbins estate. Morris claims the insurance moneys were turned over to him by Harry and Mrs. Glaser on account of what the Glaser estate owed him at that time and that the money was therefore his and that he used it in part payment for the assignment by the Dobbins estate. He produced a statement showing that at that time the Glaser estate was indebted to him in excess of the sum of the insurance checks; but as the insurance moneys really belonged to the Dobbins estate because of its mortgage, the Glasers had no right to apply those moneys otherwise than in reduction of the mortgage. If there had been no assignment of the mortgage and the Dobbins estate had foreclosed, credit must have been given by that estate for the insurance money. But even if paid in full, the estate could have kept the mortgage alive for its full amount had it been necessary or advisable, and, as the estate was undoubtedly indebted to Morris in more than the amount of the insurance checks, the excess over the amount for which the Dobbins estate could have proved the mortgage might very well have been applied to Morris' claim and the mortgage thus kept alive for the full amount of its face value. This is apparently what was done. That it was clumsily done is not surprising in view of the many other unusual methods which were adopted in the plan of financing and the foreclosure proceedings. But the form the transaction took is not important in equity. Aside from these facts, it is suggested that, as the fire occurred after the new hotel was erected, Harry and Sarah were entitled to the insurance moneys by right of subrogation, that the mortgagee had no interest therein, and that Harry and Sarah could apply them as they saw fit and that their application to Morris' claim cannot now be challenged. This may be so, but it is unnecessary for me to decide the question in view of what I have already said. I find, therefore, that the master's report was correct in its finding of the amount of principal *Page 600 
due on the first mortgage, but incorrect as to the amount of interest due thereon. The interest should be computed at five per cent. instead of six per cent. and the complainant should pay into court the excess of interest which he received as stated in my former opinion.
 2. INTEREST OF JEANNETTE GLASER.
Jeannette Glaser, being still an infant, has the same interest in this surplus fund which she had in the mortgaged premises. That is an undivided one-third interest in such sum as represents the value of those premises in excess of the amount due on the first and second mortgages, plus foreclosure costs, on the date of the sale, subject, however, to the dower right of Sarah Glaser, and subject, also, to the rights of Harry and Sarah, if any, to subrogation to the increased value of the property by reason of the improvements made by them and by reason of their payments on account of the principal of the $5,500 mortgage. But in fixing these rights they are not to be enlarged, nor are the rights of the other parties to be defeated, merely because this claimant happens to be an infant. In re Shreve, 87 N.J. Eq. 7;affirmed, 87 N.J. Eq. 710; Graves v. Graves, 94 N.J. Eq. 268.
The total value of the equity in this property on the date of the foreclosure sale I have fixed at $4,547.48 as will hereinafter appear. From this should be deducted the present value of the widow's dower, also hereinafter fixed at $705. This will leave a net equity of $3,832.48, to one-third of which, or $1,280.83, Jeannette is entitled.
 3. INTEREST OF MAX GLASER.
Except for the alleged ratification or estoppel by reason of his conduct after he became of age, Max Glaser would be entitled to the same as Jeannette. There is no doubt whatever but that Max had full knowledge, notwithstanding his minority, of everything that was being done in connection with *Page 601 
the erection of the new hotel, its financing by means of loans from the banks and others, by the complainant's endorsements and of the foreclosure of the mortgage and the sheriff's sale. Subsequent efforts to refinance and the negotiation of new mortgages to that end were participated in by him both before and after he attained his majority. He attended the foreclosure sale. He took an active interest in the construction of the hotel, and helped about its management. While he was still an infant, apparently concealing that fact from the banks, he signed two notes of $10,000 and $9,000, respectively, which were discounted at the banks, and thereafter, when he had attained his majority, renewed the notes periodically and finally paid one of them in full. He sat in at the conference at which the moneys paid to the banks in this proceeding were applied to the various notes and obligations held by the banks. He lived at the hotel with his mother, brother and sister. Whatever he did was with complete knowledge of all the transactions and of his rights. He stated that he had as much right in the property as Harry, long after he became of age, and objected to some of the charges for refinancing. It is significant that although in the court room during the various hearings, he did not take the stand to deny or explain any of his actions or conduct. All inferences, therefore, should be resolved against him. 22 Corp. Jur. 81, 115 §§ 24,55, 56; United States v. Commissioner, 273 U.S. 103;71 L.Ed. 561; United States v. Tod, 263 U.S. 149; 68 L.Ed. 221; Kirby
v. Tallmadge, 160 U.S. 379; 40 L.Ed. 463. He waited one year and eight months after he attained his majority before making any complaint. At this time it had become apparent that the Glaser family could not refinance itself. It was only then that he changed his course and pursued another tack. In the meantime, the banks had canceled and surrendered the notes which were paid by the application of the moneys which they had received and applied with his approval, notes which bore the endorsements of financially responsible individuals some of whom are now dead. There is no doubt in my mind but that Max has by his conduct ratified all of the transactions *Page 602 
of which he now complains, and that because of that conduct he is now estopped to assert rights which would otherwise be his. 2Pom. Eq. Jur. (4th ed.) §§ 804 et seq.; 21 Corp. Jur. 1202,1216; Bayonne v. Passaic Consolidated Water Co., 98 N.J. Eq. 174; Ketcham v. Ketcham, 84 N.J. Eq. 577; Muller v. Thomann,104 N.J. Eq. 289; Aron v. Rialto Realty Co., 100 N.J. Eq. 513;affirmed, 102 N.J. Eq. 331; 31 Corp. Jur. 1015, 1017. There are many other circumsances indicating conduct by him which, in my judgment, spell both estoppel and waiver, but I will not enlarge on an overlong opinion to recite them. My conclusion on this point is that Max Glaser has no right whatever to participate in the distribution of this surplus fund.
 4. INTEREST OF HARRY GLASER.
It is undisputed that Harry Glaser was entitled to a one-third interest in the equity of the mortgaged premises at the time of his father's death, and at the time he executed the mortgages to the banks and the contractor, and that whatever his interest is, is covered by those mortgages. This proceeding being for a division amongst co-tenants of that which stands in the place of land of which they were co-tenants, equitable principles applicable to actual partition should apply. The rule in partition respecting improvements by a co-tenant, already adverted to, is, in my judgment, applicable in this proceeding to the same extent as it would be if this were a proceeding strictly in partition. I have found no New Jersey decision directly in point, nor has the diligence of counsel referred me to any; but the case of Salem National Bank v. White, 159 Ill. 136;42 N.E. Rep. 312, is, I think, on all fours with the instant case. There one tenant in common mortgaged the common property to secure a loan used in the improvement of that property, and it was held that the mortgagee was entitled to a lien on the interest of the mortgagor, and also on the increase in the value of the interest of the other co-tenants caused by such improvements. In that case the court said: *Page 603 
"When the mortgage of 1889 was executed to secure an indebtedness representing money used in improving the property, Susan White and Joseph I. White were tenants in common, she owning three-fourths and he one fourth. He was a tenant in common with the other children when the mortgage of 1877 was made. If his interest in the land was made more valuable by reason of the improvements, and will sell for more at the partition sale on that account, it would seem to be just that he should make compensation. The doctrine, in equity, is that when improvements have been made by one tenant in common, the portion improved should, if practicable, be assigned to him in the partition of the estate; and when such a division cannot be made, he should be allowed a reasonable remuneration from those who receive the benefits of the improvement. Where the premises are sold because they are not susceptible of division, the tenant in common making the improvement should be allowed the actual increase of the price received at the sale in consequence of the improvement made. Louvalle v. Menard, 1 Gilman 39; Howey v. Goings,13 Ill. 95; Dean v. O'Meara, 47 Ill. 120; Kurtz v. Hibner,55 Ill. 514; Mahoney v. Mahoney, 65 Ill. 406. In the case at bar, appellee Joseph I. White should be charged, as between him and his co-tenant, Susan White, with such increase in the amount which his one-fourth interest in the land shall bring at the sale as results from the fact of its being improved. Cooter v.Dearborn, 115 Ill. 509; 4 N.E. Rep. 388. If Mrs. White is entitled to such increase, her lien therefor passes to appellant by virtue of the mortgage executed by her. Improvements placed on real estate by the mortgagor inure to the benefit of the mortgagee, and so, if one tenant in common places improvements upon the common property, and thereby acquires a lien on his co-tenant's interest for a proportionate share of the increase in value caused by the improvement, it will be an accession to his interest, which will be subject to a mortgage given by him on the property, and will pass to the mortgagee, to the same extent, in the same manner, and for the same reasons that the improvements became liable *Page 604 
to the lien of the mortgage. Baird v. Jackson, 98 Ill. 78. In other words, the mortgagee is entitled to be subrogated to the lien of the mortgage improving the property, as tenant in common, for such proportionate share of increase in value or price as inures to the benefit of the other tenant in common by reason of the improvements. Lagger v. Association, 146 Ill. 283;33 N.E. Rep. 946. We are, therefore, of the opinion that * * * there should be paid to the appellant, out of the proceeds of the sale of the interest of Joseph I. White in the premises, such proportion of such proceeds as shall represent the increase added to the amount of the sale of said interest by reason of the improvements."
The rule that improvements made by a mortgagor inure to the benefit of a mortgagee, and the rule in partition respecting the right of one co-tenant against another co-tenant because of improvements made to the common property at his expense, and which formed the basis of the decision in the Illinois case, are both recognized in this state. 41 Corp. Jur. 483, 485; Holloway
v. Hendrick, 98 N.J. Eq. 713; Booraem v. Wood, 27 N.J. Eq. 371
(reversed on other grounds, 28 N.J. Eq. 450); Shipman v.Shipman, 65 N.J. Eq. 556; Gray v. Case, 51 N.J. Eq. 426.
There is no doubt, therefore, but that Harry's interest in the mortgaged premises should be enhanced to the amount of the additional value contributed by the improvements which he made. But it is not necessary now to determine that exact amount. It will be discussed later. It is certain, however, that one $5,000 note was made and perhaps others endorsed by him, the proceeds of which went into the new building, and it is clear that he supervised all the work and made himself personally liable to the extent of the bank's and lumber company's claims, by executing bonds which were secured by the mortgages to the banks and to the contractor. To arrive at the amount of the actual value of Harry's interest, as enhanced by the improvements, it will be necessary to fix the value of the property before the improvements were made. Whatever his interest in the surplus funds, it is now vested in his mother by virtue of his will, subject, of course, to the claims of other parties to this suit. *Page 605 
 5. INTEREST OF SARAH GLASER.
In order to determine the value of Sarah Glaser's interest in the surplus fund, the value of her dower interest in the mortgaged premises at the time of the death of her husband and at the date of the foreclosure sale, must be first determined. I think it must be assumed from the testimony of expert witnesses that in 1918, when Simon Glaser died, there was no equity in the property above the first and second mortgages. After her husband's death Mrs. Glaser as administratrix estimated the total value of the decedent's land, including property not embraced within the first and second mortgages, at $24,000. This value was stated by the widow under oath in her application for letters of administration on her husband's estate. The amount of the principal of the mortgages on the hotel property at that time was $23,500. As to the value placed upon the mortgaged premises in the inheritance tax report, we are left to inference only as she refused to produce the report at the hearing, availing herself of her privilege not to do so. Whatever inferences are to be drawn from this attitude on her part must be against her interest. All witnesses who testified as experts on the value of the mortgaged premises agreed that the value of the premises in 1918 and 1922 was represented by the value of the land alone and that the building was of no value whatever. One witness said the building had a junk value of $1,000. Under the circumstances of this case I think we are more concerned, however, with the value of the land at the date of the foreclosure sale, because it is as of that date that the infant Jeannette is entitled to have her share in the equity in the property determined, and it is that value that I shall consider. Whether under other circumstances the value of the widow's dower should be determined as of some other date, is immaterial here, because, as I view the matter, she will be entitled to nothing on the distribution anyway. The weight of the evidence of the expert witnesses with respect to the value of the premises is that between 1918 and *Page 606 
1922 the land was worth from $25,000 to $28,000, and that at the time of the sale on June 6th, 1927, the land was worth $34,000. Adding the junk value of the building, in fairness to the infant, we have a total value of $35,000. This latter figure is the one which I shall accept as the basis for determining the value of the widow's dower. The value placed upon the property by the witness Lazarus was greatly in excess of the valuation of any other local witness, but his valuation was, in my judgment, born of the optimism of youth. This witness, at the time he testified (January, 1930) was twenty years of age; in 1927, the date of the sale, he was seventeen years of age; in 1922, but twelve, and in 1918, only eight; undoubtedly a precocious youngster, but his testimony as to values is not to be accepted in preference to that of seasoned realtors whose judgment was based upon an experience in local real estate circles covering a period of twice the present span of this witness' life. Other experts from distant parts of the state connected with financial institutions from which loans were sought, also placed a high valuation on the land as of 1928 and 1930, but we are not concerned with the value of the land at that time, except as it may reflect previous values, and I believe the testimony of local real estate men is more reliable. In connection with this discussion I think it also entirely proper to take into consideration the value of the land as assessed by the local tax assessor. In 1918 the land was assessed at $15,000; in 1922 at $15,500, and in 1927, $16,500. While assessed valuations are not always a safe guide as to real values, they are at least significant, especially when a court is called upon to choose between expert witnesses whose testimony with respect to values is so widely at variance.
Assuming that the value of this land at the date of the foreclosure sale was $34,000 and the value of the old building which had then been destroyed was $1,000, we must compute the total of charges against that combined value by reason of the first and second mortgages. On the date of the sale there was due on these mortgages, and for costs on the foreclosure proceedings, the following amounts: *Page 607 
First mortgage, amount of decree .......... $22,371.35
Interest to date of sale .................. 443.69
 __________ $22,825.04
Second mortgage, amount of decree ......... 4,100.00
Interest to date of sale .................. 81.00
 __________ 4,181.00
Payments on account of second mortgage to which widow
 is entitled to subrogation .......................... 1,400.00
Interest on $1,000 from July 23d 1920, to date of
 sale ................................................ 410.50
Interest on payment of $400 from December 14th, 1922,
 to date of sale ..................................... 108.00
Taxed costs on foreclosure and interest thereon ....... 818.48
Sheriff's fees apportioned to the value of the land
 alone on the basis of the sale price ................ 709.50
 ___________
 $30,452.52

Deducting this amount from the $35,000, the value of the mortgaged premises as above determined, would leave an equity in the property on the date of the sale of $4,547.48. At the hearing the widow testified that she would be fifty-four years of age in April, 1930. Her dower is one-third of the equity or $1,515.83. The yearly income at four per cent. on this sum would be $60.63; the present value of that annuity at age fifty-four is eleven and six hundred and twenty-eight thousandths times $60.63, or $705. (See mortality table appended to chancery rules.) To this amount should be added $1,400 for payments on account of the principal of the $5,500 mortgage, to which payments she is entitled, as against the heirs, to be subrogated; the amount of the increased value of the premises due to improvements made by her; and whatever interest she acquired under Harry's will. The sum of these four items represents her interest in the premises at the time of the sale and also in that which now stands in the place of the land. This interest, whatever it may be, is subject to the rights of subsequent encumbrancer defendants, and these rights will be determined under the next heading.
It is not suggested that the foregoing calculation as the result of which I have fixed the value of the widow's dower is absolutely correct, but I believe it is approximately so. In determining this value, I have had no assistance from counsel. If it is not correct, the errors may be corrected in the decree of distribution. *Page 608 
Counsel for the widow suggests that the time as of which the dower should be assigned is the time at which she consented to such assignment, citing Mulford v. Hiers, 13 N.J. Eq. 13, and that such consent was given on December 23d 1929, but that she has not consented to accept a sum in gross in lieu of dower. That is incorrect. Such consent by the widow as is required under the circumstances of this case was given by her when she executed the mortgages to the banks and the lumber company. Thereafter the power of consent or election was in her assignee. Potter v.Watkins, 104 N.J. Eq. 13. They have elected and consented by this proceeding to accept a sum in gross and this election cannot be avoided by the widow.
 6. VALIDITY AND EFFECT OF SARAH GLASER'S MORTGAGE.
"The status of the widow with regard to the lands of her husband, before the assignment of her third, is most peculiar. In some respects it is altogether unique. Although the title of dower is perfect on the death of the husband, the title of entry does not accrue until her portion has been set off in certainty, so that it has been said that this affords the only instance in which a title, complete in itself, and unobstructed by any adverse right of possession, does not confer upon the person in whom it resides, the capacity to reduce it into possession.
"`The dowress,' says Parke, at page 153, `has no seizin in law, nor can she exercise any act of ownership before assignment.' Neither can this inchoate interest be levied upon and sold under execution, nor is it assignable at law. In short, the authorities all agree upon the point, that at this state of the right of the widow, she has nothing in the land on which an estate `can be predicated' and that such right is a mere chose in action."Wade v. Miller, 32 N.J. Law 296 (at p. 306); See, also,Fuchs v. Christie, 79 N.J. Law 14; Capital Circle v.Schmitt, 84 N.J. Eq. 95; Tenbrook v. Jessup, 60 N.J. Eq. 234;Shields v. Hunt, 39 N.J. Eq. 485; 19 Corp. Jur. 535 § 213. *Page 609 
But while there is no doubt that the foregoing expresses the rule at law, it is not a rule of which the widow may take advantage. She is estopped by her own deed and it does not lie in her mouth to deny her title or right to mortgage her dower interest. Her contention and that of the infant defendants now is that, because she had no estate in the mortgaged premises at the time she executed the mortgages, her interest is not bound; but in this proceeding, if by admeasurement she acquires an estate in the premises, or in that which now stands in the place of the land, it will, as far as she is concerned, inure to the benefit of her mortgagee and she will not be permitted to deny her title or interest. Den v. Gardner, 20 N.J. Law 556; Tully v.Taylor (Court of Errors and Appeals), 84 N.J. Eq. 459;Northrup v. Ackerman, 84 N.J. Eq. 117. In Den v. Gardner,supra (at p. 560), the court said:
"Whatever may be the effect of ordinary deeds of conveyance without warranty in concluding a grantor, who has released or conveyed without interest, yet in relation to mortgages the question is well settled. By an equitable estoppel, based upon the legal fraud which would be otherwise permitted, one who mortgages land as his own, upon suit thereupon brought against him, shall not be permitted to derogate from his own mortgage, by denying his title, or by setting up title in any third person. * * *
"Such estoppel between mortgagor and mortgagee, is admitted and recognized both in England and in this country."
This language was quoted with approval by the court of errors and appeals in Tully v. Taylor, supra, and almost a century ago, in Decker v. Caskey, 3 N.J. Eq. 446, this court held that "if a mortgage be made of an estate to which the mortgagor has not a good title, and then he who has the real title conveys to the mortgagor or his representatives a good title, the mortgagee will be entitled in equity to the benefit of it." Whatever, therefore, may be the character of her dower consummate before admeasurement or assignment, her mortgage, as between her and her mortgagee, is good; and if in this proceeding dower is assigned and the defects in her *Page 610 
title thus cured, such title as she then obtains will inure to the benefit of her mortgagee, and she is estopped to deny her previous title. 2 Kerr Real Prop. 839; 2 Scrib. Dow. 45, 47; 1Tiff. Real Prop. 805; Strong v. Clem, 12 Ind. 37.
It is true that the widow's interest in this property was notat law subject to assignment, mortgage or conveyance before admeasurement. Her right has been characterized by the authorities as a chose in action, a right to compel admeasurement or assignment; but a chose in action has almost time out of mind been assignable in equity. Fidelity Union Trust Co. v. Reeves,96 N.J. Eq. 490; Bacon v. Bonham, 33 N.J. Eq. 614; Sullivan v.Visconti, 68 N.J. Law 543; 5 Corp. Jur. 848 et seq.
As early as 1797 our state policy of approval of such assignments was established by the legislature. Patterson'sLaws, page 254. And an assignment of dower before admeasurement will be sustained in a court of equity. 19 Corp. Jur. 536
§ 215; Huston v. Seeley, 27 Iowa 183. See, also, numerous cases cited in 19 Corp. Jur. 535, 536. And it has been held that the purchaser of an unadmeasured dower interest may come into a court of equity to admeasure such dower as against heirs and to compel a conveyance by the widow after such dower is admeasured.Johnston v. Loose (Mich.), 167 N.W. Rep. 1021. It has also been held that a mortgage of a dowress on her unassigned dower will be sustained in equity. 19 Corp. Jur. 536. Where a widow joins with her heirs in the execution of a mortgage after the husband's death, so far as the mortgagee is concerned, she is estopped to claim dower or quarantine rights. 19 Corp. Jur. 533
§ 208, and cases cited. In Freiot v. La Fountaine, 16 Misc.
(N.Y.) 153; 38 N.Y. Supp. 832, it was held that a mortgage executed by two of five heirs and the widow to whom another of the heirs had conveyed his one-fifth is effective to bar the widow's dower right in the one-fifth interest of each of the two heirs who joined with her in executing the mortgage, although her dower interest had not been admeasured.
In Tompkins v. Fonda, 4 Paige 448, it was held that the unassigned dower of a widow could be reached by a creditor *Page 611 
in equity and subjected to the lien of his judgment at law. There the court said:
"At law, the widow's right of dower, previous to an assignment thereof, is not an estate or freehold in the lands of her deceased husband, but is a mere right or chose in action. She has not, therefore, such an interest in the land as can be sold on execution. Neither can she, before assignment and entry, convey her dower right to a stranger, by any of the ordinary modes of conveying freehold estates, so as to vest the legal interest in her grantee. Watk. Con. by Merrifield 41; Jickling Leg. Eq.Estates 362; 4 Dowl. R. 276; 9 Mass. 13. But in equity, if the widow is in possession, or is entitled to an assignment of dower immediately, the want of a mere formal assignment of dower is not considered material. And if she has received the income of the whole premises, either as guardian of the heir-at-law, or otherwise, she will, upon the taking of an account thereof, be entitled to retain her third, although her dower has not been assigned. 1 P. Wms. 122. She has no right, therefore, in conscience or in equity, to deprive her creditors of the benefit of her right of dower, for the satisfaction of their debts, by continuing in possession with the heirs and neglecting to ask for a formal assignment; which assignment, and entry under it, would enable the creditors to reach it by execution."
In Mutual Life Insurance Co. v. Shipman, 119 N.Y. 324;24 N.E. Rep. 177, the New York court of appeals said:
"She had possession of the land under a consummate right of dower, of which she could enforce admeasurement. Although this right, while unassigned, did not give her a legal estate in the land, it is now well settled that it was a legal interest, and constituted property which was capable in equity of being sold, transferred and mortgaged by the dowress, and liable to bereached by creditors in payment of her debts. Tompkins v.Fonda, 4 Paige 448; Simar v. Canaday, 53 N.Y. 298; Payne v.Becker, 87 N.Y. 153; Pope v. Mead, 99 N.Y. 201;1 N.E. Rep. 571; Bostwick v. Beach, 103 N.Y. 414; 9 N.E. Rep. 41.
"Such a right, although a mere chose in action, and constituting no legal estate in the land, is nevertheless one which *Page 612 
cannot be enforced against any property other than the land; and, when enforced, creates a legal estate therein paramount to the right of those holding the legal title. A mortgage of such an interest operates as a conditional transfer of the right to enforce admeasurement of dower, and enables the mortgagee to reduce to possession so much of the land as is necessary to satisfy the requirements of the mortgage."
The doctrine of Tompkins v. Fonda, supra, was adopted by Vice-Chancellor Grey in Tenbrook v. Jessup, 60 N.J. Eq. 234.
After referring to that case with approval, the learned vice-chancellor continued:
"It is distasteful to the law that a debtor should be permitted to have and enjoy assets which ought to be applied to the payment of debts, without recognizing that obligation. It is still more repulsive to the law that a debtor, having things in action, should avoid taking such a course as would apply them to the payment of his debts, and make conveyance of them without consideration while they have not yet ripened into legal assets, all for the purpose of avoiding the payment of debts, and thereby defeating creditors of their rights."
See, also, Schuhardt v. Wittcke, 76 N.J. Eq. 119; affirmed,78 N.J. Eq. 292. What a court of equity will compel a debtor to do to satisfy the just claims of his creditors, he may do voluntarily. A fortiori, then, should Mrs. Glaser's mortgage, voluntarily given for a valuable consideration, be sustained in equity as an assignment of her right to compel assignment of her dower.
It is contended that a dowress cannot convey her dower interest before assignment to anyone except to a terre tenant, or to one in privity of estate, and that a mortgagee is neither terre
tenant nor in privity of estate. In 1 Washb. Real Prop. 251, it is said:
"The principle * * * that until assignment made, dower is not the subject of sale or conveyance, so as to vest legal title in the assignee or alienee and enable him to sue for it in his own name, is recognized in courts of equity as well as law. But where such sale or assignment is made, equity will protect the rights of the assignee and sustain an action in the widow's name for his benefit." *Page 613 
And at page 252:
"The most she can do is to release it to someone who is in possession of the lands or to whom she stands in privity of estate; she cannot invest another with it. She cannot, therefore, mortgage it before it is assigned."
I think it may be conceded that ordinarily a mortgagee would not be considered as either a terre tenant, unless he were in possession, or in privity of estate to the mortgagor. But a widow's dower right before the death of her husband is an inchoate right. She cannot convey it or mortgage it separately from her husband; that is, by her separate deed, but she can by joining with her husband in a deed or mortgage. She can, therefore, bar her dower prior to her husband's death and while the right is inchoate only. The reason given for denying the right of a widow entitled to dower consummate the right to convey, release or bar it, is that, although the title is perfect the estate itself is so nebulous, unascertained and indefinable that it cannot be the subject of a conveyance at law; but the inchoate right of dower is even more nebulous and of less stability as a property right or estate in land than is dower consummate before assignment. Dower consummate is a much more substantial right than dower inchoate. If a mortgage of her inchoate right of dower is valid and effective when made by joinder with her husband during his lifetime, then it would seem that after the death of the husband, when her right is consummate, and thus more substantial, her joinder with the heir in a mortgage should be just as valid and effectual as a bar to that dower right, at least in a court of equity. Prior to the death of the husband, he holds the legal title subject to the inchoate right of dower; subsequent to his death, the heir holds the legal title subject to dower consummate. In each case the mortgagee has become, in effect, a conditional grantee of the legal title. Although the mortgage is considered as security for a debt only, the mortgagee has a legal estate in the land after breach of condition. Woodside v. Adams, 40 N.J. Law *Page 614 417. There would seem to be no reason in principle, therefore, why she should not be permitted to release her dower in conjunction with the heir after that dower becomes consummate, just as effectually as she could by joinder with her husband while the dower was inchoate. In the instant case, Harry Glaser had the legal title to an undivided one-third interest in the fee, subject to the dower right of Sarah Glaser. By virtue of Harry's mortgage, the mortgagee obtained a conditional grant of the legal title to his undivided one-third interest. It would seem clear, therefore, that at least to the extent of her dower right in this one-third interest her mortgage is good. If it is good, she is a mortgagor. If, as mortgagor, therefore, she made the improvements which have resulted in the enhanced value of the mortgaged premises, they of necessity inure to the benefit of the mortgagee. If both she and Harry made those improvements, the result is the same. It is unnecessary for me to decide whether or not her mortgage was good beyond her dower right in Harry's undivided one-third interest, for her improvements as mortgagor of her dower in one-third, are just as much improvements of the mortgagor as though she were mortgagor of her dower in the whole, and they none the less inure to the benefit of the mortgagee. Her dower interest before the improvements was practically nothing. The value of that interest at the time of the sale over and above what was due on the first and second mortgages was due almost entirely to the improvements made by the mortgagors, and the mortgagees have the right to subrogation to the rights of the mortgagors by reason of such improvements.
In Salem Bank v. White, supra, a mortgage on the unassigned dower interest of the widow was not sustained, and it is insisted that if that case is an authority at all in this proceeding, then the widow's mortgage here is invalid; also that she and not Harry made the improvements and consequently the mortgagees have no right to subrogation. But the Illinois decision is not binding on this court. It is approved only in so far as it seems to this court to be consonant with equity and justice, but its adoption in part does *Page 615 
not preclude its rejection, also, in part. I refuse to follow the Illinois decision in so far as it concerns the widow's mortgage, as I do not think it is in accord with the principles of equity as administered in this state. Mrs. Glaser has succeeded to Harry's inheritance and to his rights in the fund which stands in the place of the land. Harry's estate inures to the benefit of her mortgagee. By the application of this equitable doctrine of estoppel, the validity of her mortgage is determined as though, at the time she executed it, she had the same title as that with which she is vested at the time the estoppel becomes effective. This being so, the case is brought squarely within Freiot v.La Fountaine, supra. There the widow had succeeded to an undivided one-fifth interest in land subject to her dower which was unassigned. She gave a mortgage on her interest in the premises and it was held that her mortgage was good not only as to her dower in the one-fifth, to which she had succeeded, but also as to her dower in other undivided interests.
Other arguments of counsel for the infant defendants will now be mentioned, not because I think there is any merit in them, but merely to indicate that they have not escaped my attention.
There is no estoppel against the banks and the lumber company because of the proofs submitted by them before the master which precludes the submission of the evidence which has been received on this application. Before the master, they proved merely the amount due on their respective mortgages and the order of their priority. They were not required to prove anything else. There was no other issue. Their notices to have their respective encumbrances reported upon admitted only the amount due and the priority of the first and second mortgages and those admissions only can be used as a basis of estoppel. It is true that they should have filed answers instead of notices to report, in view of the infant defendants (Rule 186), but they did not do so; and as practically all the subsequent proceedings were in some respects defective, the only safe and proper course is for the court to now retrace its steps to the point where the errors began and now do *Page 616 
what should have been done in the first instance. This can be accomplished only upon an application of this kind.
It is also contended that the present position of the banks and lumber company is due to the negligence of their counsel, by which they are bound; that they have no right to open the decree except upon newly-discovered evidence and that they have had their day in court and should not be given another opportunity. It is true that ordinarily the negligence of counsel is the negligence of the client, but the rule should not be applied where it will work an inequity. True, these parties have had their day in court, but not on the issues tried out in this proceeding. Those issues were not raised before the master and they had no opportunity to try them there. This is not a new trial or a rehearing of a matter which has already been heard. Decisions such as In re Roberson, 95 N.J. Eq. 672, do not apply here. The issues tried on this proceeding are new and could be raised only, under the pleadings, on an application for surplus moneys.
It will be seen that although the proceedings in this foreclosure suit were very irregular the proceeds of the sale were, with the exception of the share to which the infant Jeannette is entitled, properly distributed. Since that is so, there appears to be no good reason why those moneys should be paid into court only to be paid out again to the same parties who now have them. The complainant, as assignee of certain judgments, was the last distributee as shown by the sheriff's statement of distribution. As such he received more than enough to pay the share to which Jeannette is entitled. He will be required to disgorge to the extent necessary to pay her claim, and, as this whole controversy is the result of his mistakes and misconduct, or those of his solicitor, in the prosecution of the foreclosure suit, he must be required to pay the costs of this proceeding. He will be held to be primarily liable to respond to the decree in default of which other encumbrancer defendants who have already participated in the distribution will be held liable in the inverse order of the priority of their respective encumbrances.
I will advise a decree in accordance with these conclusions.
 *Page 1